## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| MATTHEW MCAFEE, on behalf of himself and all others similarly situated, | ) ) Case No. 1:24-cv-01168-JPH-MJD |
| | ) |
| Plaintiff, | ) Removed from: |
| | ) Hamilton County Superior 3 |
| v. | ) Cause No. 29D03-2406-CT-006326 |
| | ) |
| DRAFTKINGS, INC., | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT DRAFTKINGS INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE .............................. 3

    A.    ACCOUNT CREATION AND CONTRACT FORMATION ................... 3

    B.    RELEVANT CONTRACT TERMS .......................................... 4

    C.    THE PLAINTIFF, THE BET, AND ITS ODDS ..................................... 5

    D.    DRAFTKINGS DISCOVERS THE ERROR AND VOIDS THE BET ................................................................................ 7

    E.    THE IGC REJECTS PLAINTIFF'S COMPLAINT ............................... 10

    F.    NBA PLAYER STATISTICS .................................................. 10

    G.    CONTEMPORANEOUS AND COMPARABLE MARKETS DEMONSTRATE THE ERROR ........................................... 11

III.  PLAINTIFF'S "STATEMENT OF MATERIAL FACTS NOT IN DISPUTE" MISCONSTRUES THE RECORD AND IGNORES THE CONTRACT ...................................................................................... 13

IV.   PROCEDURAL BACKGROUND .................................................. 14

V.    ARGUMENT ................................................................................ 15

    A.    LEGAL STANDARD .............................................................. 15

    B.    THE PARTIES ENTERED INTO A VALID AND ENFORCEABLE CONTRACT ............................................ 16

        1.    Plaintiff Expressly Agreed to DraftKings' Terms and House Rules .............................................................. 16

        2.    Plaintiff Confirmed His Acceptance of the Terms by Using DK Sportsbook ...................................................... 19

        3.    Plaintiff's Theory That the "Bet Is the Contract" Is Not Legally Viable ...................................................... 20

    C.    DRAFTKINGS DID NOT BREACH THE TERMS OR HOUSE RULES ................................................................................ 21

        1.    DraftKings Properly Voided the Bet for Error ........................... 23

            a.    The Bet was Premised on a Factual Error ..................... 23

            b.    The Bet was Premised on a Market Error ....................... 25

            c.    The Undisputed Record Confirms the Market Was Created and Accepted Due to Technical Error ............... 27

        2.    DraftKings Was Not Legally Required to Void the Bet
              Before the NBA Game Ended ..................................................... 27

        3.    Plaintiff's  Sworn  Testimony  Precludes  Him  From
              Contesting That an Error Occurred............................................ 29

   D.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT FAILS
        AS A MATTER OF LAW......................................................................... 30

        1.    Plaintiff Misconstrues Indiana Code Section 4-38-5-6; the
              Statute Does Not Require Voiding Before the Event Ends ....... 30

        2.    The IGC's Approval of the House Rules and Subsequent
              Determination Regarding the Bet Confirms that Section 4-
              38-5-6 Allows Post-Event Voiding................................................ 33

        3.    Plaintiff's Misreading of the Statute Ignores the Statute's
              Context and the Regulatory Framework .................................... 35

        4.    DraftKings' Contractual Right to Void Controls ........................ 37

VI.  CONCLUSION................................................................................................. 39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amini Innovation Corp. v. Anthony California Inc.*,
No. CV 03-8749, 2006 WL 6855371 (C.D. Cal. Sept. 21, 2006) ............................ 12

*Anderson v. Donahoe*,
699 F.3d 989 (7th Cir. 2012) ................................................................................. 28

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................... 15

*Arrotin Plastic Material of Ind. v. Wilmington Paper Corp.*,
865 N.E.2d 1039 (Ind. Ct. App. 2007) ................................................................... 22

*Browning v. Trans Union LLC*,
No. 4:24-CV-00029-TWP-KMB, 2025 WL 1503973 (S.D. Ind. May 27, 2025) ..... 17

*Buckner v. Sam's Club, Inc.*,
75 F.3d 290 (7th Cir. 1996) ................................................................................... 30

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......................................................................................... 15, 16

*Collins v. McKinney*,
871 N.E.2d 363 (Ind. Ct. App. 2007) ..................................................................... 20

*Cowen v. Bank United of Texas, FSB*,
70 F.3d 937 (7th Cir. 1995) ................................................................................... 15

*In re Daily Fantasy Sports Litigation*,
MDL No. 16-02677-GAO, 2019 WL 6337762 (D. Mass. Nov. 27, 2019) ............... 18

*Dayhuff v. Canonie Constr. Co.*,
283 N.E.2d 425 (Ind. Ct. App. 1972) ..................................................................... 22

*Ethyl Corp. v. Forcum-Lannom Assocs., Inc.*,
433 N.E.2d 1214 (Ind. Ct. App. 1982) ................................................................... 38

*Fat Butter, Ltd v. BBVA USA Bancshares, Inc*,
No. 4:09-CV-3053, 2010 WL 11646900 (S.D. Tex. Apr. 13, 2010) ........................ 19

*Ind. Dep't of Env't Mgmt. v. Steel Dynamics, Inc.*,
894 N.E.2d 271 (Ind. Ct. App. 2008) ..................................................................... 34

*Indiana GRQ, LLC v. Am. Guarantee & Liab. Ins. Co.*,
663 F. Supp. 3d 857 (N.D. Ind. 2023) ..................................................................... 18

*Jallali v. Nat'l Bd. of Osteopathic Med. Examiners, Inc.*,
908 N.E.2d 1168 (Ind. Ct. App. 2009)............................................................. 16, 20

*JIPC Mgmt., Inc. v. Incredible Pizza Co.*,
No. CV 08-04310 MMM PLAx, 2009 WL 8591607, at *24 (C.D. Cal. July 14,
2009)........................................................................................................................ 12

*Johnson Cnty. Farm Bureau Co-op. Ass'n v. Ind. Dep't of State Revenue*,
568 N.E.2d 578 (Ind. Tax Ct. 1991), *aff'd,* 585 N.E.2d 1336 (Ind. 1992) ............. 34

*Kelly v. Levandoski*,
825 N.E.2d 850 (Ind. Ct. App. 2005)...................................................................... 21

*League of Women Voters of Ind., Inc. v. Sullivan*,
5 F.4th 714 (7th Cir. 2021)..................................................................................... 32

*McNeil v. Anonymous Hosp.*,
219 N.E.3d 789 (Ind. Ct. App. 2023)...................................................................... 32

*Middleton v. City of Chicago*,
578 F.3d 655 (7th Cir. 2009) .................................................................................. 31

*Modrowski v. Pigatto*,
712 F.3d 1166 (7th Cir. 2013) .......................................................................... 15, 16

*Mundell v. Beverly Enters.-Indiana, Inc.*,
778 F. Supp. 459 (S.D. Ind. 1991)......................................................................... 32

*Partin v. Baptist Healthcare Sys., Inc.*,
135 F.4th 549 (7th Cir. 2025)................................................................................. 15

*Pawlak v. BBVA USA Bancshares Inc.*,
No. CIV.A H-09-3277, 2010 WL 3119909 (S.D. Tex. Aug. 4, 2010)...................... 19

*Pierce v. State Dep't of Corr.*,
885 N.E.2d 77 (Ind. Ct. App. 2008).................................................................. 34, 35

*Precision Industries v. Qualitech Steel SBQ*,
327 F. 3d 537 (7th Cir. 2003) ................................................................................. 31

*Rojas v. GoSmith, Inc.*,
No. 2:17-CV-281-JVB-JEM, 2020 WL 831585 (N.D. Ind. Feb. 20, 2020)............. 16

*Ruff v. Charter Behavior Health Sys.*,
  699 N.E.2d 1171 (Ind. Ct. App. 1998) ..................................................................... 23

*Sgouros v. TransUnion Corp.*,
  817 F.3d 1029 (7th Cir. 2016) ........................................................................ 16, 20

*Sherman v. AT&T Inc.*,
  No. 11 C 5857, 2012 WL 1021823 (N.D. Ill. Mar. 26, 2012) ................................. 17

*Smart Corp. v. Grider*,
  650 N.E.2d 80 (Ind. Ct. App. 1995) ........................................................................ 21

*Stinger v. Chase Bank, USA, NA*,
  265 F. App'x 224 (5th Cir. 2008) ........................................................................... 19

*Tamburo v. Hyundai Motor Am. Corp.*,
  No. 23-CV-00282, 2024 WL 22230 (N.D. Ill. Jan. 2, 2024) ................................... 17

*Treiber & Straub, Inc. v. UPS, Inc.*,
  474 F.3d 379 (7th Cir. 2007) .................................................................................. 17

*United States v. Serrano*,
  434 F.3d 1003 (7th Cir. 2006) ................................................................................ 12

*Waldridge v. Am. Hoechst Corp.*,
  24 F.3d 918 (7th Cir. 1994) .................................................................................... 16

*Whitaker v. Dempsey*,
  144 F.4th 908 (7th Cir. 2025) ................................................................................. 15

*Zoeller v. E. Chi. Second Century, Inc.*,
  904 N.E.2d 213 (Ind. 2009) ................................................................................... 28

**Statutes & Rules**

Fed. R. Civ. P. 56(a) ................................................................................................ 15

Fed. R. Evid. 801(c) ................................................................................................. 12

Fed. R. Evid. 803(17) ............................................................................................... 12

Indiana Code section 4-38-3-1 ................................................................................. 33

Indiana Code section 4-38-5-6 ........................................................................*passim*

S.D. Ind. L.R. 56-1(a) .............................................................................................. 13

**Other Authorities**

68 Ind. Admin. Code 27-5-3 ............................................................................ 28, 33, 36

68 Ind. Admin. Code 27-7-12 ....................................................................................... 33

https://www.merriam-webster.com/thesaurus/cancel ................................................ 36

## I.    <u>INTRODUCTION</u>

In this putative class action, Plaintiff Matthew McAfee ("Plaintiff") challenges Defendant DraftKings Inc.'s ("DraftKings") decision to void a bet he placed on an NBA basketball game in October 2023. Plaintiff placed a $100 seven-leg parlay bet (the "Bet") with a potential payout of $150,100 on DraftKings' Online Sportsbook platform ("DK Sportsbook"). Due to an error, Plaintiff was able to place the Bet at obviously erroneous, long-shot odds. DraftKings briefly and inadvertently posted first-quarter player point totals as full-game totals for an NBA game between the Los Angeles Lakers and Denver Nuggets (the "LAL/DEN Game"), enabling Plaintiff to bet that seven players in this game would score "over" 4.5 to 9.5 points in the entire game— at odds that did not remotely reflect the likelihood of success of such bets or the odds present in the general market for such bets. For example, DraftKings erroneously projected that LeBron James would score 8.5 points in the entire game—something he has not done since 2007. The prior season, LeBron James averaged 28.9 points for an entire game.

DraftKings discovered the error within roughly thirteen minutes of the erroneous markets being posted and immediately removed these "over" bets from its platform.[1] After notifying the Indiana Gaming Commission ("IGC"), DraftKings

---

[1] In sports betting, a "market" refers to a specific wagering category—such as the number of points a player will score in a game or quarter. The markets at issue in this matter are each defined by a numerical "line" (for example, 25.5 points for the entire game for a player like LeBron James) that determines whether a bet wins or loses. The "odds" for that market, which dictate the potential payout, reflect both the sportsbook's assessment of the likelihood of each outcome and include the sportsbook's margin. The Error (as defined in the House Rules) here arose from the

voided the Bet pursuant to its IGC-approved House Rules, which expressly allow DraftKings to void bets accepted due to precisely this type of error. Those House Rules—which Plaintiff repeatedly agreed to—unambiguously authorize DraftKings to void any bet "offered, placed, and/or accepted due to an Error," and to do so "regardless of whether the event has been settled or not." That is what happened here. Plaintiff's attempt to characterize the Bet as an independent contract is meritless, as he cannot point to any separate agreement between the parties. The House Rules plainly govern, and they authorized DraftKings to void the Bet.

Before filing this lawsuit, Plaintiff complained to the IGC that DraftKings improperly voided the Bet. The IGC responded by saying that it did not identify any violation of Indiana law or regulation. This Court should do the same and grant DraftKings' motion for summary judgment.

Conversely, Plaintiff's motion for summary judgment should be denied. Plaintiff knew that the over/under lines for the LAL/DEN Game were erroneous and attempted to exploit them; he effectively concedes that the Bet was premised on an Error. He does not dispute that DraftKings may void a bet accepted in Error and admitted that he fully expected DraftKings to void his Bet for that very reason. Faced with the reality that DraftKings at all times acted in accordance with its House Rules, Plaintiff instead rests his entire case on a misreading of Indiana Code section 4-38-5-6. He argues that the statute imposes a temporal limitation on *when* a sportsbook

---

parlay markets themselves, which were mistakenly configured to reflect quarter-game point totals as full game totals, thereby generating obviously incorrect odds.

may void an error, and that DraftKings acted too late by voiding the Bet after the
underlying game ended. Putting aside the record evidence showing that DraftKings
decided to void the Bet long before the game ended, Plaintiff's argument fails on its
face. The statute he invokes does not limit a sportsbook's contractual discretion to
void bets for error—or dictate when such voiding must occur. In fact, it does the
opposite by reaffirming that such discretion exists. Even if Plaintiff's statutory theory
carried any weight—which it does not—his interpretation fails as a matter of law
and, as even Plaintiff admits, he therefore "cannot prevail." [Dkt. 133 at 2.]

Because the governing contract (the House Rules) unambiguously authorizes
the void, and the statute does not forbid it, Plaintiff's breach of contract claim
collapses.

## II.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### A.    ACCOUNT CREATION AND CONTRACT FORMATION

Plaintiff is a resident of Indiana and has been a DraftKings customer since
2019. [Dkt. 138-1 at 11 (McAfee Dep. at 12:1–9); *id.* at 22 (McAfee Dep. at 23:9–13);
Dkt. 138-2 at 8 (Ex. A).] On December 14, 2019, Plaintiff agreed to DraftKings' Terms
for Indiana Gaming Products (as of October 3, 2019) (the "Terms") and DraftKings'
applicable rules such as the Market Rules, General Rules, and Basketball Rules (as
of 2019) (collectively the "House Rules"). [Dkt. 138-2 at 8 (Butterworth Decl. ¶ 4, Ex.
A).]

Customers must agree to DraftKings' Terms, which incorporate by reference
the House Rules, at the time they register for an account, and reaffirm each time
those Terms are updated. [Dkt. 138-1 at 104 (30(b)(6) Dep. at 30:1–10); Dkt. 138-1 at

3

76–77 (McAfee Dep. at 196:7–25, 197:14–16).] Plaintiff testified that he "did a standard sign-up" and is aware that agreeing to the Terms is a condition of using the DraftKings platform. [Dkt. 138-1 at 74–75 (McAfee Dep. at 194:16–195:3).] Plaintiff agreed to a revised version of DraftKings' Terms, which are attached as Exhibit B to the Butterworth Declaration. [Dkt. 138-2 at 8 (Ex. A).] The IGC-approved House Rules, attached as Exhibit C to the Butterworth Declaration, include all relevant provisions in effect when Plaintiff placed his Bet. [Dkt. 138-2 at 24 (Butterworth Decl. ¶ 6, Ex. C).]

## B. **RELEVANT CONTRACT TERMS**

The operative Terms state:

> DraftKings ("DraftKings" or the "Company") owns and operates the website that links to these Terms of Use ("Website"). DraftKings is pleased to offer you access to the Website and the ability to participate in online gaming ... subject to these Terms of Use, the privacy notice available here (the "Privacy Policy"), the DraftKings Sportsbook House Rules ...

[Dkt. 138-2 at 10 (Ex. B).]

The operative House Rules state:

> These DraftKings Sportsbook House Rules [], as well as the DraftKings Sportsbook Terms of Use [] govern your use of the DraftKings Sportsbook. When placing a bet on the DraftKings Sportsbook, the Authorized Account Holder agrees that the Authorized Account Holder has read, understands, and will adhere to these Rules, as well as the Terms at the time of the bet placement.

[Dkt. 138-2 at 36 (Ex. C, General Rule 1.1).]

In the operative House Rules, DraftKings expressly disclosed that bets may be voided if offered in "error":

> ***DraftKings reserves the right***, at its own discretion, ***to declare a bet void, totally or partly, irrespective if the bet is settled***, ***if it is obvious that*** any of the following circumstances have occurred: [] ***Bets have been offered, placed and/or accepted due to an Error***[.]

[*Id.* at 39 (Ex. C, General Rule 5.4) (emphasis added).]

"Error" is defined in the House Rules as, in part, "a mistake," including but not limited to (1) "odds being clearly incorrect given the chance of the event occurring at the time the bet was placed" (i.e., a "Factual Error"); (2) "bets placed at odds that are materially different from those available in the general market at the time the bet was placed" (i.e., a "Market Error"); and (3) "bets accepted during technical problems that would otherwise not have been accepted" (i.e., a "Technical Error"). [*Id.* at 37 (Ex. C, General Rule 2.1(a), (d), (f)).] The operative House Rules further state that "Bets can be voided regardless of whether the event has been settled or not." [*Id.* at 40 (Ex. C, General Rule 5.7).]

### C.   THE PLAINTIFF, THE BET, AND ITS ODDS

Plaintiff describes himself as an "expert" sports bettor. [Dkt. 138-1 at 20 (McAfee Dep. at 21:15–23).] From March 2022 until September 2024, including at the time he placed the Bet, Plaintiff said he was a "professional gambler." [*Id.* at 20–21 (McAfee Dep. at 21:24–22:4).] During that time, Plaintiff was "doing full-time sports gambling content production" and he worked seven days a week on that endeavor. [*Id.* at 15–16 (McAfee Dep. at 16:7–11; 17:20–25).] In October 2023—at the time he placed the Bet—Plaintiff wagered on DK Sportsbook "almost every day, if not every day." [*Id.* at 58 (McAfee Dep. at 108:11–14).]

The 2023–24 regular season of the National Basketball Association ("NBA") began on October 24, 2023. [Dkt. 138-1 at 132 (Ex. C); *see also* Request for Judicial Notice ("RJN").] That day, Plaintiff placed the seven-leg parlay Bet on the Los Angeles Lakers versus Denver Nuggets NBA game (the "LAL/DEN Game") through DK Sportsbook.[2] [Dkt. 138-1 at 154 (Ex. D).] Each leg of the Bet required a specific player to score more than a designated number of points during the *entire* LAL/DEN Game. [*Id.*] For example, for one leg of the Bet to succeed, LeBron James needed to score more than 8.5 points over the course of the entire game. [*Id.*] In order for the Bet to succeed, all of the legs needed to succeed. [Dkt. 138-1 at 29 (McAfee Dep. at 41:8–11).] Plaintiff wagered $100 on the Bet for a potential payout of $150,100, reflecting odds of 1,500-to 1 or +150,000. [Dkt. 138-1 at 154 (Ex. D).] When he made the Bet, Plaintiff recognized that the points each player needed to score for the Bet to win were "lower than they should be" and were "lower than [he] would have expected." [Dkt. 138-1 at 43 (McAfee Dep. at 93:8–23).]

Plaintiff testified further that "[a]s soon as I pulled up the app and I was looking at the player props [i.e., the individual legs of the Bet], I started putting them together in a parlay and, yeah, I was like, I like where I'm at with this bet." [*Id.* at 45 (McAfee Dep. at 95:8–13).] Indeed, Plaintiff recognized that the "over/under lines on players' points" for, at minimum, Nikola Jokić and LeBron James were erroneous. [*Id.* at 48 (McAfee Dep. at 98:8–25).] When Plaintiff made the Bet, Plaintiff knew

---

[2] In sports betting, a "leg" refers to an individual selection or component within a multi-part bet, such as a parlay bet.

that: (i) Jokić's points per game were historically far greater than 9.5 [*id.* at 49 (McAfee Dep. at  99:4–7)]; (ii) James' points per game were historically far greater than 8.5; [*id.* (McAfee Dep. at 99:11–14)]; and (iii) Nikola Jokić and LeBron James averaged more than 20 points per game in the prior NBA season [*id.* at (McAfee Dep. 99:15–17).]

Plaintiff also testified that, after placing the Bet, he made a similar parlay wager on FanDuel for the same LAL/DEN Game and acknowledged that FanDuel's odds were "drastically different" from DraftKings' odds for several of the same players. [Dkt. 138-1 at 50–51 (McAfee Dep. 100:8–101:18); *id.* at 228 (Ex. P).] In a contemporaneous text exchange with another sports bettor about his DraftKings wager, Plaintiff wrote that he did not "expect [the Bet] to pay. If it does, sweet. Life keeps on going." [Dkt. 138-1 at 228 (Ex. E).] When asked to explain that statement, Plaintiff admitted that he "expected DraftKings to try to go after a void" because he recognized that the Lakers–Nuggets player prop lines were a "glitch"—his term for "off-market" or "irregularly high odds." [Dkt. 138-1 at 65–67 (McAfee Dep. at 167:11–169:4).] Accordingly, even Plaintiff knew that the Bet was based on obviously erroneous odds and he anticipated that DraftKings would void it.

### D.    DRAFTKINGS DISCOVERS THE ERROR AND VOIDS THE BET

DraftKings used a third-party vendor, SportCast, to provide parlay markets for the LAL/DEN Game. [Dkt. 138-1 at 110 (30(b)(6) Dep. at 36:17–24).] DraftKings sometimes contracts with a vendor like SportCast to provide the lines, such as how many points a player would score in a particular game, for wagers on DK Sportsbook, rather than DraftKings performing that function internally. On October 23, 2023,

7

SportCast advised DraftKings that it intended to offer betting markets for first-quarter player point totals in the LAL/DEN Game. [Dkt. 139-1 (Ex. E ).] A betting market for first-quarter player point totals would allow customers to bet on whether or not players would score over or under a projected number of points in the first quarter alone. [*See* Dkt. 138-1 at 111–112 (30(b)(6) Dep. at 37:17–38:7).] On October 24, 2023, DraftKings informed SportCast that it was not able to offer the first-quarter markets SportCast had proposed due to technical limitations on DraftKings' platform.[3] [Dkt. 138-1 at 112–113 (30(b)(6) Dep. at 38:10–18, 39:2–8); Dkt. 139-1 (Ex. E).]

Despite this warning from DraftKings, on October 24, 2023, at approximately 4:22 p.m. ET, SportCast released first-quarter markets for the LAL/DEN Game, which means that the first-quarter markets for the LAL/DEN Game were then available to DraftKings' customers. [Dkt. 139-2 (Ex. F).] As SportCast had been advised, DK Sportsbook automatically and erroneously offered the intended first-quarter player-prop markets as full-game markets. [*See* Dkt. 138-1 at 112 (30(b)(6) Dep. at 38:12–18); Dkt. 139-2 (Ex. F).] Plaintiff placed his Bet at those incorrect odds. [Dkt. 139-3 (Ex. G); Dkt. 138-1 at 111–112 (30(b)(6) Dep. at 37:17–38:7).]

At approximately 4:33 p.m. ET, DraftKings informed SportCast that the first-quarter markets odds were incorrect. [Dkt. 139-2 at 4 (Ex. F).] Two minutes later, SportCast suspended those markets. [*Id.*] The LAL/DEN Game began at 7:30 PM ET.

---

[3] *See* Dkt. 139-1 (Ex. E) The email bears a timestamp of 4:51 p.m. on October 24, 2023, which reflects the sender's local time in London, England, corresponding to 11:51 a.m. ET in the United States. [Dkt. 138-2 (Butterworth Decl. ¶ 7).]

[Dkt. 138-1 at 121 (30(b)(6) Dep. at 47:10–11).] At approximately 7:59 p.m. ET, Plaintiff received an email from DraftKings regarding the Bet, which stated that DraftKings was "investigating a potential issue related to the odds offered . . . settlement [of Plaintiff's Bet] will be delayed while we review bets placed on these markets, and determine if any action in accordance with our Terms of Use and House Rules is necessary." [Dkt. 138-1 at 158 (Ex. F).]

Voiding bets—particularly those on markets offered nationwide—requires DraftKings, among other things, to consult with or, for some states, to obtain permission from state regulatory agencies. Given the myriad state-by-state regulatory requirements, voiding bets offered in a nationwide market requires significant consideration, communication, and time. Here, DraftKings Regulatory Operations team, which provides final approval to the Trading team for voiding bets, ultimately approved voiding the Bet after consulting with the IGC. [Dkt. 138-1 at 126 (30(b)(6) Dep. at 52:8–16).] That regulatory process made it extremely unlikely, if not impossible, that the Bet could have been voided before the LAL/DEN Game had concluded, much less before it started. [Dkt. 138-1 at 122 (30(b)(6) Dep. at 48:12–17).] Indeed, DraftKings' process for voiding bets typically cannot be completed until after the game has finished, as expressly permitted by its House Rules. [Dkt. 138-1 at 120, 122 (30(b)(6) Dep. 46:10–11, 48:12–17).]

On October 25, 2023, DraftKings informed Plaintiff that DraftKings voided the Bet. [Dkt. 138-1 at 160 (Ex. G).] DraftKings did not pay Plaintiff $150,100 [Dkt. 138-

1 at 88–89 (McAfee Dep. at 217:23–218:2)], but refunded Plaintiff's $100 stake. [Dkt. 138-1 at 234 (Ex. Q).]

### E.    THE IGC REJECTS PLAINTIFF'S COMPLAINT

On October 25, 2023, Plaintiff submitted a formal complaint to the IGC about DraftKings' decision to void the Bet. [Dkt. 138-1 at 162 (Ex. H).] On October 30, 2023, the IGC responded in part:

> Upon review of your complaint, it has been determined that the IGC cannot assist you in this matter. The IGC was unable to identify any rule or regulatory violation in this instance. Sportsbooks do not require approval of the IGC to cancel wagers for obvious error, nor does IGC make determinations whether obvious error is applicable. Pursuant to Indiana Statute, it is the Sportsbook's sole discretion to cancel wagers due to obvious error. . . Unless advised to the contrary, the IGC finds this matter to be resolved and we do not anticipate any further action regarding this matter.

[Dkt. 138-1 at 164 (Ex. I).] The IGC's October 30, 2023 letter to Plaintiff expressly cited and quoted the same statute Plaintiff relies upon in this case, Indiana Code section 4-38-5-6, which Plaintiff now attempts to claim that DraftKings violated. [*Id.*]

### F.    NBA PLAYER STATISTICS

The following table lists the erroneous lines in the Bet compared to the average NBA regular season points per game for each of the seven players included in the Bet, both in the seasons before and after the LAL/DEN Game:

| Player | Plaintiff's Point Line in the Bet | 2022-23 Regular Season Average | 2023-24 Regular Season Average |
|---|---|---|---|
| Michael Porter Jr. | 5.5 | 17.4 | 16.7 |
| Anthony Davis | 9.5 | 25.9 | 24.7 |
| Austin Reaves | 4.5 | 13 | 15.9 |
| D'Angelo Russell | 4.5 | 17.8 | 18 |
| Jamal Murray | 7.5 | 20.0 | 21.2 |
| LeBron James | 8.5 | 28.9 | 25.7 |
| Nikola Jokić | 9.5 | 24.5 | 26.4 |

[Dkt. 138-1 at 154; 166–176 (Ex. D; Exs. J–M, NBA scoring statistics for players on the Los Angeles Lakers and Denver Nuggets); *see also* RJN.]

LeBron James holds the NBA record for consecutive games scoring double-digit points; as of this writing, the last time he scored under 10 points in a regular season NBA game was January 5, 2007. [Dkt. 138-1 at 178 (Ex. N at p. 2, NBA stats for LeBron James); *see also* RJN.] Nikola Jokić was unanimously voted the 2023 NBA Finals Most Valuable Player ("MVP")—he had previously won the NBA MVP award for both the 2020–21 and 2021–22 seasons. [Dkt. 138-1 at 217 (Ex. O); *see also* RJN.] The other players reflected in the Bet had scoring averages two to four times higher than the clearly erroneous projections.

## G.   CONTEMPORANEOUS AND COMPARABLE MARKETS DEMONSTRATE THE ERROR

At the same time as the Bet at issue here, DraftKings offered full-game markets for the LAL/DEN Game. These "single bets"—in other words, a bet solely on

how many points a particular player would score during an entire game that is not combined (i.e. parlayed) with another bet—featured dramatically different odds than the Bet. For example, at the time Plaintiff placed the Bet, DraftKings offered a full-game market on LeBron James to score over or under 22.5 to 23.5 points, with odds fluctuating between -150 and +120—yielding payouts (or profit over the bettor's stake) between $66.67 and $120 for a $100 winning bet, depending on when the bet was placed. [Dkt. 139-3 (Ex. G).] Publicly available sportsbook odds reflected consistent market expectations for player scoring performance at that time. Again using Lebron James as an example, other sportsbooks offered comparable markets that he would score between 23.5 and 24.5 points for the entire game, yielding payouts between $84.75 and $115.00 for a $100 winning bet. [Dkt. 138-2 at 481 (Ex. H).][4]

DraftKings also offered a full-game, non-parlay market on Nikola Jokić to score between 25.5 and 26.5 points, with odds fluctuating between -140 and +110—yielding

---

[4] The player-prop lines (i.e., markets on a player's specific scoring performance within a game) published by other sportsbooks are not offered for the truth of any predictive content, but to demonstrate contemporaneous market expectations and the obvious disparity from those market lines and the Bet. *See* Fed. R. Evid. 801(c). The Court may consider these industry lines as circumstantial evidence of the industry consensus at the time of the Bet. *See United States v. Serrano*, 434 F.3d 1003, 1005 (7th Cir. 2006); Fed. R. Evid. 801(c) Advisory Committee Note ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."). In the alternative, these contemporaneous betting-line compilations qualify under Fed. R. Evid. 803(17) as "market quotations" or "commercial publications" generally relied upon by participants in the sports-betting industry. *See JIPC Mgmt., Inc. v. Incredible Pizza Co.*, No. CV 08-04310 MMM PLAx, 2009 WL 8591607, at *24 (C.D. Cal. July 14, 2009); *Amini Innovation Corp. v. Anthony California Inc.*, No. CV 03-8749, 2006 WL 6855371, at *3 (C.D. Cal. Sept. 21, 2006).

payouts between $71.43 and $110 for a $100 winning bet, depending on when the bet was placed. [Dkt. 139-3 (Ex. G).] Contemporaneously, other sportsbooks offered a 25.5 point line on Nikola Jokić, with payouts ranging between $81.97 and $92.59 for a $100 winning bet. [Dkt. 138-2 at 481 (Ex. H).] The contemporaneous markets offered by both DraftKings for full-game point total markets—and by the broader industry generally—drastically differed from those underlying the Bet.

## III. PLAINTIFF'S "STATEMENT OF MATERIAL FACTS NOT IN DISPUTE" MISCONSTRUES THE RECORD AND IGNORES THE CONTRACT

In support of his own motion for summary judgment, Plaintiff submitted a "Statement of Material Facts Not in Dispute." [Dkt. 133 at 3.] It mischaracterizes the record and omits critical context, and includes argumentative assertions that go beyond what Local Rule 56-1(a) permits.[5] As set forth below, those statements should be disregarded to the extent they imply conclusions contrary to the governing Terms and House Rules.

Plaintiff incorrectly claims that "[t]he Wager was accepted by DraftKings, and DraftKings agreed to pay McAfee $150,000 if the Wager won" and that "[a]ll seven legs of the Wager hit, so it was a winning Wager[.]" [Dkt. 133 at 3.] Those statements are misleading. Plaintiff's framing assumes that any bet accepted by DraftKings that "hits" must be paid. That is incorrect. Every bet placed on DK Sportsbook is governed

---

[5] Under Local Rule 56-1(a) and its accompanying Note, a movant's "Statement of Material Facts Not in Dispute" must identify *material* facts—those "potentially determinative" of the motion—and "state facts, not the party's argument." S.D. Ind. L.R. 56-1(a) & Note to Subdivision (a).

by the Terms and House Rules, which expressly define when and under what circumstances a bet that "hits" will be settled as a "win" and paid out to the customer. [*See* Dkt. 138-2 at 10 and 24 (Exs. B & C).] Under those governing rules, bets are subject to cancellation in the event of, among other things, an "obvious error."

Moreover, Plaintiff cites no evidence that DraftKings ever settled or designated the Bet as a "winning" bet. To the contrary, the record reflects only that the Bet "would have won if not voided by DraftKings." [Dkt. 132-1 at 7 (DraftKings' discovery response merely stating the Bet "would have won if not voided by DraftKings").] A bet that is voided pursuant to DraftKings' House Rules is not—and cannot be— deemed a "winning" bet requiring payment.

## IV.   **PROCEDURAL BACKGROUND**

On June 10, 2024, Plaintiff Matthew McAfee filed this action in the Hamilton County Superior Court of Indiana. On July 11, 2024, DraftKings removed the action to this Court. [Dkt. 1.] On August 14, 2024, DraftKings filed its Motion to Dismiss the action. [Dkt. 30.] On February 7, 2025, the Court entered its Order on Defendant's Motion to Dismiss. [Dkt. 81.] The Court granted Defendant's Motion to Dismiss as to the DCSA claims, leaving only Plaintiff's claim for breach of contract. [*Id.* at 9.] On February 12, 2025, Plaintiff filed a Motion for Leave to File a First Amended Complaint. [Dkt. 82.] On May 9, 2025, the Court denied that motion. [Dkt. 102.]

14

On June 11, 2025, Plaintiff filed an amended motion to certify a class. [Dkt. 108.] On June 27, 2025, DraftKings opposed that motion. [Dkt. 116.] That motion remains pending.[6]

## V.   **ARGUMENT**

### A.   **LEGAL STANDARD**

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material only if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *Id.*; *see also Whitaker v. Dempsey*, 144 F.4th 908, 916 (7th Cir. 2025). "Mere metaphysical doubt as to the material facts is not enough." *Celotex*, 477 U.S. at 323. Nor are inferences "that are supported by only speculation or conjecture." *Partin v. Baptist Healthcare Sys., Inc.*, 135 F.4th 549, 560 (7th Cir. 2025) (citation omitted).

The initial summary judgment burden is on the moving party to show the Court that there is no reason to have a trial. *Celotex*, 477 U.S. at 323; *Modrowski v.*

---

[6] This motion seeks summary judgment on Plaintiff's remaining breach of contract claim individually and on behalf of the putative class. Because the same dispositive legal issues govern all alleged class members, entry of summary judgment in DraftKings' favor would necessarily dispose of the entire action. Accordingly, class certification issues will be moot if this motion is granted. *See Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995).

*Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). The moving party may satisfy its burden in one of two ways: (i) it may present evidence that affirmatively negates an essential element of the nonmoving party's case; (ii) or it may point to an absence of evidence to support an essential element of the nonmoving party's case without actually submitting any evidence. *Celotex*, 477 U.S. at 322-25 (citing Fed. R. Civ. P. 56(c)(1)(A) & (B)); *Modrowski*, 712 F.3d at 1169. If the "non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court *must* enter summary judgment against her." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (emphasis in original).

## B. THE PARTIES ENTERED INTO A VALID AND ENFORCEABLE CONTRACT

### 1. Plaintiff Expressly Agreed to DraftKings' Terms and House Rules

It is well-settled that electronically-executed contracts like the Terms—often referred to as "clickwrap agreements"—are enforceable. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033–1034 (7th Cir. 2016) (explaining "[t]here is nothing automatically offensive about [clickwrap] agreements" and collecting cases upholding them); *see also Rojas v. GoSmith, Inc.*, No. 2:17-CV-281-JVB-JEM, 2020 WL 831585, at *3 (N.D. Ind. Feb. 20, 2020) (explaining that under Indiana law, clickwrap agreements are enforceable when user "had reasonable notice of and manifested assent to the agreement"). "The primary focus when deciding whether a clickwrap agreement is enforceable is whether the party clicking it had reasonable notice of and manifested assent to the agreement." *Jallali v. Nat'l Bd. of Osteopathic Med.*

16

*Examiners, Inc.*, 908 N.E.2d 1168, 1173 (Ind. Ct. App. 2009). "Whether there was reasonable notice and manifested assent is determined through an objective inquiry." *Browning v. Trans Union LLC*, No. 4:24-CV-00029-TWP-KMB, 2025 WL 1503973, at *2–3 (S.D. Ind. May 27, 2025) (explaining that "the inquiry hinges on two issues: (1) was there adequate notice of the terms and opportunity to review the terms, and (2) was it clear that the user was manifesting assent by clicking the button"). "The clickwrap process of checking a box next to hyperlinked terms generally provides adequate notice to a user, and thus courts routinely uphold these agreements." *Tamburo v. Hyundai Motor Am. Corp.*, No. 23-CV-00282, 2024 WL 22230, at *4 (N.D. Ill. Jan. 2, 2024); *see also Sherman v. AT&T Inc.*, No. 11 C 5857, 2012 WL 1021823, at *3 (N.D. Ill. Mar. 26, 2012) (collecting cases); *Treiber & Straub, Inc. v. UPS, Inc.*, 474 F.3d 379, 385 (7th Cir. 2007) (affirming summary judgment on the liability-limiting language in UPS' "Terms and Conditions of Service" document that the plaintiff accepted by clicking a hyperlink).

Plaintiff repeatedly accepted DraftKings' Terms by clicking through the standard sign-up process and again when prompted by later updates.[7] [Dkt. 138-2 at 8 (Ex. A); Dkt. 138-1 at 104 (30(b)(6) Dep. at 30:1–10).] DraftKings' corporate representative confirmed that customers must affirmatively assent to the Terms by checking a box during registration and again when prompted to accept any updated

---

[7] Although Plaintiff later equivocated at his deposition when asked whether the Bet was governed by DraftKings' Terms and House Rules—responding, "I'm sorry, I'm unable to answer your question" [Dkt. 138-1 at 88 (McAfee Dep. at 217:12–17)]—that testimony does not negate nor create a material issue of fact as to his repeated assent to the Terms, which indisputably governed his use of DK Sportsbook.

Terms. [Dkt. 138-1 at 104–105 (30(b)(6) at 30:1–3, 30:23–31:1).] Plaintiff acknowledged that agreeing to the Terms was a condition of using DK Sportsbook. [Dkt. 138-1 at 74 (McAfee Dep. at 194:16–19).] Plaintiff again consented to continue to use his account in accordance with the updated Terms on June 1, 2023. [Dkt. 138-1 at 104 (30(b)(6) Dep. at 30:1–10); Dkt. 138-2 at 8 (Ex. A).] DraftKings' records confirm that Plaintiff repeatedly assented to the then-operative Terms, including the 2023 updates. [Dkt. 138-2 at 8 (Ex. A).] That repeated assent forms the material terms of the parties' commercial relationship—in other words, a binding contract. *See In re Daily Fantasy Sports Litigation*, MDL No. 16-02677-GAO, 2019 WL 6337762, at *2 (D. Mass. Nov. 27, 2019) (noting that "the prospective [DraftKings] player would not be able to complete the sign up without checking a box next to text stating 'I agree to the Terms of Use and Privacy Policy and confirm that I am at least 18 years of age[,]'" and "[a] prospective player had to check the box indicating agreement to the Terms of Use and Privacy Policy before the sign up could be completed.").

Where a written contract expressly incorporates another document by reference, both are construed together as the parties' single, integrated agreement. *Indiana GRQ, LLC v. Am. Guarantee & Liab. Ins. Co.*, 663 F. Supp. 3d 857, 872 (N.D. Ind. 2023) (explaining that when "a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties"). Here, DraftKings' Terms expressly incorporate the House Rules by reference, making the two documents a

single, binding contract governing Plaintiff's account and activity with DraftKings. [Dkt. 138-2 at 10 (Ex. B).]

### 2. Plaintiff Confirmed His Acceptance of the Terms by Using DK Sportsbook

Even if Plaintiff's affirmative acceptance of the Terms did not bind him as a matter of law—and it does—his continued use of DK Sportsbook after receiving a copy of the operative Terms on June 1, 2023, and the House Rules incorporated therein, provides a separate and distinct basis for establishing his acceptance of the Terms and House Rules. *See, e.g.*, *Fat Butter, Ltd v. BBVA USA Bancshares, Inc*, No. 4:09-CV-3053, 2010 WL 11646900, at *11 (S.D. Tex. Apr. 13, 2010) ("[B]y using its [bank] accounts, Plaintiff demonstrated an intent to be bound by the terms of the Disclosure Booklet[.]"); *cf. Stinger v. Chase Bank, USA, NA*, 265 F. App'x 224, 227 (5th Cir. 2008) (finding that plaintiff "demonstrated an intent to be bound by the terms" of credit card agreement by using card); *Pawlak v. BBVA USA Bancshares Inc.*, No. CIV.A H-09-3277, 2010 WL 3119909, at *2 (S.D. Tex. Aug. 4, 2010) ("By continuing to use his account after receiving the disclosure booklet, [plaintiff] demonstrated an intent to be bound by the terms of the amended Agreement").

The Terms state that Plaintiff:

> [A]gree[d] to these Terms of Use by accessing or using the Website [linked to the Terms], registering for Services offered on the Website, or by accepting, uploading, submitting or downloading any information or content from or to the Website. IF YOU DO NOT AGREE TO BE BOUND BY ALL OF THESE TERMS OF USE, DO NOT USE THE WEBSITE.

[Dkt. 138-2 at 10 (Ex. B ).]

Plaintiff admits that he placed numerous bets on DK Sportsbook after opening his DraftKings account, including daily or nearly daily bets in October 2023 when he placed the Bet. [Dkt. 138-1 at 36, 58 (McAfee Dep. at 65:19–21, 108:11–14).] These undisputed facts independently establish that the Terms and House Rules form a binding contract governing Plaintiff's account with DraftKings. *See Sgouros*, 817 F.3d at 1033-34; *Jallali*, 908 N.E.2d at 1173.

### 3. Plaintiff's Theory That the "Bet Is the Contract" Is Not Legally Viable

Unable to dispute his repeated assent to DraftKings' Terms and House Rules, Plaintiff has attempted to advance an alternative theory—alleging that the Bet alone is a separate and distinct contract, and that the parties' contract with regards to this dispute consists *solely* of the Bet itself. That contention is factually incorrect and unsupportable as a matter of law. As described above, by creating and using his DraftKings account, Plaintiff agreed that his bets would be governed by the Terms, which expressly incorporate the House Rules. [Dkt. 138-2 at 36 (Ex. C, General Rule 1.1).] Plaintiff's Bet, like all those made on DK Sportsbook, is subject to those Terms and House Rules. The bet itself is a transaction that is governed by the Terms and House Rules and does not override them.

Plaintiff's "Bet-as-the-contract" theory fails as a matter of basic contract law because he ignores the Terms that actually applied and cannot identify any other alternative contractual terms. To recover on a claim for a breach of contract, Plaintiff must prove that: "(1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach." *Collins v.*

*McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007). While Plaintiff alleges that the Bet alone is a separate and independent contract, he has not identified—and cannot identify—any agreement between the parties setting forth *his* purported contractual terms, much less the provision allegedly breached by DraftKings. Indeed, at his deposition, Plaintiff was unable to point to anything reflecting the terms of his supposed version of the parties' contract (i.e., the "Bet"). [Dkt. 138-1 at 87–88 (McAfee Dep. at 216:15–217:3) ("[Q.] What's the basis for the allegation here in paragraph 28 that the [Bet] was a contract between DraftKings and Mr. McAfee? . . . [A.] I'm unable to answer your question. [Q.] Mr. McAfee, when you talk about the bet being a contract, what would the contractual documents be that we would look to to understand what the contractual terms that apply here are? [A.] I'm unable to answer your question.").] Plaintiff cannot identify the terms for his "alternative" contract and therefore, as a matter of law, cannot demonstrate that some other contract was formed (it was not), much less breached. *Kelly v. Levandoski*, 825 N.E.2d 850, 857 (Ind. Ct. App. 2005) ("If a party cannot demonstrate agreement on one essential term of the contract, then there is no mutual assent and no contract is formed.").

## C.   DRAFTKINGS DID NOT BREACH THE TERMS OR HOUSE RULES

"The primary and overriding purpose of contract law is to ascertain and give effect to the intentions of the parties." *Smart Corp. v. Grider*, 650 N.E.2d 80, 83 (Ind. Ct. App. 1995). "If the intention of the parties can be gleaned from their written expression, that intention must be effectuated by the court." *Id.* Contract terms are not ambiguous merely because the parties disagree about their interpretation.

21

*Arrotin Plastic Material of Ind. v. Wilmington Paper Corp.*, 865 N.E.2d 1039, 1041 (Ind. Ct. App. 2007). Where the contract language is unambiguous, the parties' intent must be determined from "the four corners of the document." *Id.*; *Dayhuff v. Canonie Constr. Co.*, 283 N.E.2d 425, 427 (Ind. Ct. App. 1972) ("It is, therefore, needless to rely upon the depositional testimony, adduced in the record to determine the intent of the parties, for the written document speaks for itself.") Here, the only governing contract—the Terms and incorporated House Rules—unambiguously and dispositively provides that (1) the Bet is subject to the House Rules and (2) DraftKings properly voided the Bet in accordance with the House Rules. Summary judgment should therefore be granted.

The House Rules state, in relevant part:

> These DraftKings Sportsbook House Rules [], as well as the DraftKings Sportsbook Terms of Use [] govern your [customers] use of the DraftKings Sportsbook. When placing a bet on the DraftKings Sportsbook, the Authorized Account Holder agrees that the Authorized Account Holder has read, understands, and will adhere to these Rules, as well as the Terms at the time of the bet placement.

[Dkt. 138-2 at 36 (Ex. C, General Rule 1.1).]

The House Rules further make clear—in plain, unmistakable terms—that DraftKings may void bets accepted in "Error":

> ***DraftKings reserves the right***, at its own discretion, ***to declare a bet void, totally or partly, irrespective if the bet is settled***, ***if it is obvious that*** any of the following circumstances have occurred: [] ***Bets have been offered, placed and/or accepted due to an Error***[.]

[*Id.* at 39 (Ex. C, General Rule 5.4) (emphasis added).)

### 1.   DraftKings Properly Voided the Bet for Error

Under the House Rules, an "Error" expressly includes: (1) "odds being clearly incorrect given the chance of the event occurring at the time the bet was placed" (i.e., a "Factual Error"); (2) "bets placed at odds that are materially different from those available in the general market at the time the bet was placed" (i.e., a "Market Error"); and (3) "bets accepted during technical problems that would otherwise not have been accepted" (i.e., a "Technical Error"). [*Id.* at 37 (Ex. C, General Rule 2.1(a), (e), (f)).] Each of these Errors provide DraftKings with independent grounds to void the Bet.

The House Rules state that DraftKings can void bets "regardless of whether the event has been settled or not." [*Id.* at 40 (Ex. C, General Rule 5.7).] This provision is unambiguous, and no reasonable person could find otherwise. *Ruff v. Charter Behavior Health Sys.*, 699 N.E.2d 1171, 1176 (Ind. Ct. App. 1998) (measuring ambiguity against the understanding of "reasonably intelligent persons"). The undisputed evidence demonstrates that DraftKings followed the Terms and House Rules by voiding the Bet.

### a.   The Bet was Premised on a Factual Error

Under DraftKings' House Rules, a Factual Error exists when "odds [are] clearly incorrect given the chance of the event occurring at the time the bet was placed." [Dkt. 138-2 at 37 and 39 (Ex. C, General Rule 2.1(f); General Rule 5.4(a)).] Here, the Bet's odds of 15,000 to 1 were clearly incorrect given the chance that each of the seven legs of the parlay would occur at the time the Bet was placed. The lines constituted a Factual Error because of the pronounced disparity between the odds

offered by DraftKings on the Bet's single-digit lines and the likelihood the Bet would succeed. Although the Bet carried long-shot odds of 15,000 to one—purporting to return $150,100 on a $100 wager—those odds were objectively erroneous. In reality, based on recent NBA history and statistics, every player included in the Bet was overwhelmingly likely to exceed their assigned point total, meaning this was no long shot at all.

For example, in the 2022–23 regular season, LeBron James, Anthony Davis, and Nikola Jokić each averaged over 24 points per an entire game, yet DraftKings erroneously assigned over/under amounts of 8.5 or 9.5 points for the entirety of the DEN/LA Game, which actually reflected the over/under amount for the first quarter. [Dkt. 138-1 at 154; 166–170 (Ex. D; Exs. J & K; *see also* RJN).] Jamal Murray, D'Angelo Russell, and Michael Porter Jr. averaged between 17 and 20 points but were assigned lines between 4.5 and 7.5 points for the first quarter. [*Id.*] The same pattern held in the 2023–24 season, further underscoring that the Bet's payout was premised on plainly erroneous odds. [Dkt. 138-1 at 154; 172–176 (Ex. D; Exs. L & M; *see also* RJN).] Every player included in the Bet had a scoring average two to four times higher than the Bet's projections.

Plaintiff himself recognized the Factual Error. He testified that, when he made the Bet, he understood that the points each player needed to score for the Bet to win were "lower than they should be" and "lower than [he] would have expected." [Dkt. 138-1 at 43 (McAfee Dep. at 93:8–23); *see also id*. at 49 (McAfee Dep. at 99:4–17).] He described the Lakers–Nuggets player prop lines offered on DK Sportsbook as a

"glitch." [*Id.* at 65–67 (McAfee Dep. at 167:11–169:4).] Not surprisingly, after selecting the various legs of the Bet, Plaintiff responded to the Bet by noting, "I like where I'm at with this bet." [*Id.* at 45 (McAfee Dep. at 95:8–13).] Plaintiff effectively concedes that the Bet's odds were erroneous.

No reasonable fact finder—nor Plaintiff himself—could find that the odds offered by DraftKings correctly reflected the likelihood of the Bet succeeding. Because this constitutes a Factual Error, summary judgment should be granted.

### b.    The Bet was Premised on a Market Error

DraftKings may void a bet under its Market Error rule when the bettor receives odds "materially different from those available in the general market at the time the [B]et was placed." [Dkt. 138-2 at 37 and 39 (Ex. C, General Rule 2.1(d); General Rule 5.4(a).] The odds offered by DraftKings for Plaintiff's Bet were wildly out of line with (1) the odds offered by other sportsbooks and (2) the odds offered by DraftKings itself on non–parlay, full game bets.

Plaintiff's own FanDuel parlay for the same LAL/DEN Game confirms that the Bet was accepted due to a Market Error. On FanDuel, Plaintiff accepted full-game point-total lines for LeBron James over 21.5 points, Nikola Jokić over 16.5, and others in the high-teens or 20s. [Dkt. 138-1 at 50–51 (McAfee Dep. at 100:1-101:18); *id.* at 228 (Ex. P).] In contrast, DraftKings' lines for those same players in the Bet were in the single digits, generating an implausible payout multiple for the same underlying event. [*id.* at 154 (Ex. D).] That market disconnect alone establishes that the Bet satisfies the contractual definitions of a Market Error and was therefore

appropriately voided by DraftKings. [*See* Dkt. 138-1 at 118–119 (30(b)(6) Dep. at 44:3–45:14).]

The odds Plaintiff received on his Bet were not just slightly off—they were dramatically out of step with the broader betting market and even with DraftKings' own contemporaneous markets. While DraftKings' erroneous Bet assigned implausibly low single-digit point totals (e.g., LeBron James over 8.5 points and Nikola Jokić over 7.5 points for an entire game), other sportsbooks offered full-game point totals for those same players in the 23–26 point range, with payouts between $82 and $115 on a $100 bet, confirming that the Bet's were "materially different from those available in the general market at the time the [B]et was placed." [Dkt. 138-2 at 481 (Ex. H).]

In addition, the odds for Plaintiff's Bet were materially different than the lines offered for identical, non-parlay bets *on DraftKings' own platform*. At the same time Plaintiff placed the parlay Bet, DraftKings offered full-game single (i.e. non-parlay) markets for the same players—e.g., LeBron James to score over or under 22.5 to 23.5 points, with odds ranging from -150 to +120, resulting in payouts of $66–$120 on a $100 bet, and Nikola Jokić to score over or under 25.5 to 26.5 points, with odds ranging from -140 to +110, yielding payouts between $71 and $110 on a $100 bet. [*See* Dkt. 139-3 (Ex. G).] The Bet, by contrast, priced those same players with single-digit point lines and 15,000 to 1 odds, offering a wildly outsized potential payout of $150,100 on a $100 stake. The Bet was thus placed at odds that were materially different from those in market—both internal and external.

### c. The Undisputed Record Confirms the Market Was Created and Accepted Due to Technical Error

DraftKings has additional and independent grounds to void the Bet due to a Technical Error—defined in DraftKings' House Rules as when a bet is "accepted during technical problems that would otherwise not have been accepted." [Dkt. 138-2 at 37 and 39 (Ex. C, General Rule 2.1(a); General Rule 5.4(a)).] Undisputed testimony from DraftKings' corporate representative confirms that a third-party vendor, SportCast, erroneously released first-quarter player markets as full-game lines, despite being explicitly instructed not to do so. [Dkt. 138-1 at 111–113 (30(b)(6) Dep. at 37:17–38:18, 39:2–8).] As a result, DK Sportsbook automatically and mistakenly posted them as full-game markets for a little over ten minutes. [Dkt. 138-1 at 111–112 (30(b)(6) Dep. at 37:17–38:7); Dkt. 139-2 (Ex. F).]

DraftKings promptly identified and corrected the issue. At approximately 4:33 p.m. ET, DraftKings notified SportCast that the lines were wrong, and SportCast suspended the affected markets two minutes later. [Dkt. 139-2 (Ex. F).] DraftKings then reviewed the impacted bets and voided them in accordance with the Technical Error rule outlined at General Rule 2.1. Accordingly, even apart from the other bases to void, the undisputed Technical Error standing alone compels summary judgment in DraftKings' favor.

### 2. DraftKings Was Not Legally Required to Void the Bet Before the NBA Game Ended

Contrary to Plaintiff's baseless assertions, no contractual provision—in the Terms, House Rules, or otherwise—required DraftKings to void the Bet before the LAL/DEN Game started or ended. To the contrary, the House Rules explicitly allowed

DraftKings to void the Bet after the LAL/DEN Game ended and the Bet was "settled," a term Plaintiff admits he understood. [Dkt. 138-2 at 39 (Ex. C, General Rule, 5.4.] Plaintiff confirmed in his deposition that a "settled" bet means "[t]he conclusion of the event that is being bet on" and that "the outcome of the wager is – is known." [Dkt. 138-1 at 80 (McAfee Dep. at 200:1–12).] Plaintiff cannot meaningfully dispute that DraftKings acted in accordance with its Terms and House Rules when it voided the Bet after the LAL/DEN Game ended.

Faced with this inescapable fact, Plaintiff now attempts to pivot after discovery and base his contract claim on a misreading of an Indiana regulation—68 IAC 27-5-3—pursuant to which he claims that DraftKings was required to acquire regulatory approval and formally void the Bet before the LAL/DEN Game ended.  That argument is misplaced for multiple reasons.

First, Plaintiff is limited to the contract theories he has alleged. *See, e.g.*, *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) (noting that a plaintiff may not amend a complaint by introducing new legal theories during summary judgment briefing that were not included in the complaint).[8]  He cannot now plead a new theory

---

[8] Nor can Plaintiff avoid summary judgment by invoking any implied contract theory. The only contract governing the parties' relationship is the express agreement formed by DraftKings' Terms and House Rules—terms Plaintiff necessarily accepted as a condition of placing his Bet. The law is clear: "When the rights of parties are controlled by an express contract, recovery cannot be based on a theory implied in law." *Zoeller v. E. Chi. Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009) (quoting *Keystone Carbon Co. v. Black*, 599 N.E.2d 213, 216 (Ind. Ct. App. 1992)). Here, the Terms and House Rules expressly define the circumstances under which DraftKings may void a bet—including for obvious errors—and set forth the exclusive obligations between the parties regarding any bet placed.

to support his breach of contract claim after the theory he pled in the Complaint became clearly untenable.

Second, even if the Court evaluates this statutory argument on the merits, (and it should not) it fails for all the reasons explained in DraftKings' opposition (*see infra*, Opp. § D(1)–(3)): the statute contains no temporal limitation, the IGC expressly approved DraftKings' House Rules authorizing post-settlement voiding, and the IGC subsequently confirmed (twice) that such action did not violate the statute and its regulations when presented with this very dispute. Accordingly, it is undisputed that neither the contract nor the governing regulatory framework required DraftKings to void the Bet before the LAL/DEN Game ended.

### 3. Plaintiff's Sworn Testimony Precludes Him From Contesting That an Error Occurred

Plaintiff has foreclosed his ability to argue that the Bet was not accepted in Error or that DraftKings did not act within its rights to void under the House Rule. Plaintiff testified that he recognized the lines in his Bet were "lower than they should be" and were "lower than [he] would have expected." [Dkt. 138-1 at 43 (McAfee Dep. at 93:8–23).] He described the lines and odds in the Bet as a "glitch." [*Id.* at 65–67 (McAfee Dep. at 167:11–169:4).]. Plaintiff, however, then gave sworn testimony that he was "unable to answer" whether the lines on the Bet were an "obvious error," "clear mistake," "clearly wrong," a "mistake," or "wrong." [*Id.* at 92–94 (McAfee Dep. at 221:11–223:6).] Plaintiff was repeatedly asked, straightforwardly, about a central issue in this litigation. Plaintiff took the position that he could not answer those questions and is now bound by that sworn testimony, and such testimony does not

29

create any issue of material fact that the Bet was properly voided due to an Error. *Buckner v. Sam's Club, Inc.*, 75 F.3d 290 (7th Cir. 1996) ("[T]he law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony.").

### D.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT FAILS AS A MATTER OF LAW

Plaintiff's motion for summary judgment fails for a simple reason: the governing contract—the IGC-approved House Rules—expressly authorizes DraftKings to void wagers placed in error, "regardless of whether the event has been settled or not." [Dkt. 138-2 at 40 (Ex. C, General Rule 5.7).] That clear contractual authority defeats his claim at the threshold. This case begins and ends with the contract: DraftKings acted exactly as its IGC-approved House Rules authorize.

Despite those binding terms, Plaintiff stakes his entire case on a single, mistaken premise—that Indiana Code section 4-38-5-6 imposes a deadline requiring sportsbooks to void bets "by the end of the contest." He concedes that if the statute does not contain such a temporal limitation, he "cannot prevail." [Dkt. 133 at 2.] It does not. The statute's plain text and the IGC's own interpretation foreclose Plaintiff's reading and confirm DraftKings' authority to void for error after an event concludes. Accordingly, Plaintiff's motion fails under both the parties' contract and Indiana law.

#### 1.    Plaintiff Misconstrues Indiana Code Section 4-38-5-6; the Statute Does Not Require Voiding Before the Event Ends

Indiana Code section 4-38-5-6 reads in full:

> A certificate holder or vendor may not cancel a wager that has been accepted, **except in the event of obvious error**, at the certificate holder's or vendor's **discretion.** A

> certificate holder or vendor must pay winning patrons following the end of the sporting event.

(emphasis added).

Plaintiff improperly inserts additional language that does not exist in the statute to support his tortured reading that an operator can cancel a bet only "by the end of the sporting event." [Dkt. 46 at 5 ("Defendant could only—per Indiana law and its incorporation into the contract—cancel Plaintiff's Bet for "obvious error" if it did so by the end of the sporting event").] The statute's text says no such thing. Nothing in Section 4-38-5-6 imposes any temporal limitation on canceling for "obvious error." The statute contains two distinct commands addressing different functions: (1) cancellation authority for obvious error; and (2) payment timing for winning wagers. Indeed, the IGC informed Plaintiff that DraftKings did not violate the statute and its own regulations when it voided the Bet. [Dkt. 138-1 at 164 (Ex. I).]

Because the language is plain and unambiguous, the analysis ends there. *See Precision Industries v. Qualitech Steel SBQ*, 327 F. 3d 537, 544 (7th Cir. 2003) ("When the words of a statute are unambiguous . . . judicial inquiry is complete"); *Middleton v. City of Chicago*, 578 F.3d 655, 660 (7th Cir. 2009) ("It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms"). The unambiguous text allows DraftKings to void bets based on an obvious error under its IGC-approved House Rules, which expressly authorize voiding "regardless of whether the event has been settled or not."

Courts may not add restrictions the legislature did not include. *McNeil v. Anonymous Hosp.,* 219 N.E.3d 789, 796 (Ind. Ct. App. 2023); *Mundell v. Beverly Enters.-Indiana, Inc.*, 778 F. Supp. 459, 462 (S.D. Ind. 1991) (noting that it is "just as important to consider what the statute does not say as it is to consider what it does say"). The Court must interpret the statute according to what it says, not what Plaintiff wishes it said. Echoing the Indiana Supreme Court, the Seventh Circuit has cautioned that "courts may not engraft new words onto a statute or add restrictions where none exist." *League of Women Voters of Ind., Inc. v. Sullivan*, 5 F.4th 714, 723 (7th Cir. 2021) (quoting *Kitchell v. Franklin*, 997 N.E.2d 1020, 1026 (Ind. 2013)).

Reading Section 4-38-5-6 as a whole preserves its internal logic: the first sentence authorizes voiding for "obvious error," and the second governs payment of winning wagers. A wager properly voided under the first clause is no longer an "accepted wager," much less a winning one, and thus triggers no payment obligation under the second. This reading gives full effect to both clauses without judicial revision.

Plaintiff's fallback argument—that the "obvious error" exception must be construed narrowly to require pre-event cancellation—fares no better. [Dkt. 133 at 5.] Even under the authorities Plaintiff cites, any narrowing pertains to what qualifies as "obvious error," not when the operator must act. No authority permits a court to rewrite clear statutory language or impose obligations the legislature chose to omit. As the IGC has repeatedly informed Plaintiff, the record is clear that

32

DraftKings acted within its authority to void the Bet, and Plaintiff's claim fails as a matter of law.

> **2.    The IGC's Approval of the House Rules and Subsequent Determination Regarding the Bet Confirms that Section 4-38-5-6 Allows Post-Event Voiding**

The IGC's approval of DraftKings' House Rules—and its later response to Plaintiff's complaint—confirm that Indiana Code section 4-38-5-6 does *not* require a wager to be voided before an event concludes. Because the IGC is statutorily charged with approving operator house rules, its approval of DraftKings' House Rules constitutes an authoritative construction of the statute's requirements, not simply a post-hoc interpretation.

Under Indiana Code section 4-38-3-1, the IGC adopts and enforces rules for the Sports Wagering Act (the "SWA"). The SWA establishes the legal and regulatory framework governing sports betting in Indiana, and the IGC implements that framework through regulations codified in Title 68 of the Indiana Administrative Code. Pursuant to 68 Ind. Admin. Code 27-5-3, licensed operators must adopt comprehensive house rules—including "a policy by which the sports wagering operator can cancel wagers in accordance with IC 4-38"—and obtain IGC approval before those rules take effect.  68 Ind. Admin. Code 27-7-12 further provides that the definition of "obvious error" in an operator's IGC-approved house rules governs: "A sports wagering operator may, in its discretion, cancel an accepted wager for obvious error as set forth in Indiana Code section 4-38-5-6. 'Obvious error' shall be defined in the **sports wagering operator's house rules**." (emphasis added). In short, Indiana's statutory and regulatory scheme is clear: DraftKings proposes House Rules

under which it may void accepted bets for obvious error, the IGC approves those House Rules, and the House Rules govern disputes such as this one.

The IGC-approved House Rules expressly authorize DraftKings to void accepted bets in cases of obvious error, as discussed herein. The House Rules also expressly authorize voiding "regardless of whether the event has been settled or not." [Dkt. 138-2 at 40 (Ex. C, General Rule 5.7).] Therefore, the IGC's approval confirms that, consistent with Section 4-38-5-6, an operator may cancel a wager for "obvious error" at its discretion, even after an event ends.

To the extent Plaintiff argues the IGC's interpretation is incorrect, that argument fails. Courts give "great weight" to the enforcing agency's reasonable interpretation of the statute and regulations it administers, deferring to that interpretation unless inconsistent with the law itself. *See Johnson Cnty. Farm Bureau Co-op. Ass'n v. Ind. Dep't of State Revenue*, 568 N.E.2d 578, 585–86 (Ind. Tax Ct. 1991), *aff'd,* 585 N.E.2d 1336 (Ind. 1992) (finding agency interpretation entitled to deference); *Ind. Dep't of Env't Mgmt. v. Steel Dynamics, Inc.*, 894 N.E.2d 271, 274 (Ind. Ct. App. 2008) (same). "If a court determines that an agency's interpretation is reasonable, it should terminate its analysis and not address the reasonableness of the other party's proposed interpretation." *Pierce v. State Dep't of Corr.*, 885 N.E.2d 77, 89 (Ind. Ct. App. 2008).

The IGC's interpretation is both reasonable and fully consistent with the statute's text—which contains no timing restriction—and its purpose of promoting fairness and integrity in sports wagering. Under well-settled Indiana law, such a

reasonable, contemporaneous agency construction is entitled to deference. *See id.* That conclusion is reinforced by the IGC's subsequent response to Plaintiff's complaint—arising from this same Bet—in which the agency again confirmed that DraftKings acted in full compliance with state law. The IGC specifically cited Section 4-38-5-6 and found "no rule or regulatory violation," explaining:

> The IGC was unable to identify any rule or regulatory violation in this instance. . . Pursuant to Indiana Statute, it is the Sportsbook's sole discretion to cancel wagers due to obvious error[.]

[Dkt. 138-1 at 164 (Ex. I).]

This statutory and regulatory framework establishes a clear scheme of delegated discretion: the legislature instructed operators, under IGC oversight, to void wagers for "obvious error" as defined in their approved house rules. The IGC's formal approval of DraftKings' House Rules—and its subsequent determination in this very case—provide authoritative evidence that Section 4-38-5-6 permits post-event voiding consistent with the IGC's regulatory design.

### 3.    Plaintiff's Misreading of the Statute Ignores the Statute's Context and the Regulatory Framework

Plaintiff's statutory argument fails as a matter of law and raises no genuine issue of material fact. He asserts that in "common parlance, something is 'canceled' *before* it occurs." [Dkt. 133 at 5.] But Plaintiff cites no statutory text, case law, administrative interpretation, or IGC authority supporting that definition. His reliance on "common parlance" misconstrues both language and law. The term "cancel" is not limited to future events—it means to *terminate, rescind,* or *void* something previously agreed to. *See* Merriam-Webster Thesaurus, "cancel,"

https://www.merriam-webster.com/thesaurus/cancel (defining "cancel" as "to put an end to (something planned or previously agreed to)"). A wager "previously agreed to" may therefore be canceled or voided after acceptance when an error is discovered; the meaning depends on context, not timing.

That context is supplied by the governing regulatory framework—not "common parlance." Indiana's sports wagering regulations require each licensed operator to adopt, and the IGC to approve, comprehensive "house rules" that include policies for canceling wagers and defining "obvious error." 68 Ind. Admin. Code 27-5-3. DraftKings' IGC-approved House Rules—incorporated by reference into every wager—expressly authorize voiding "regardless of whether the event has been settled or not." Those regulator-approved terms, not Plaintiff's unsupported lay interpretation, control the meaning of "cancel" in this context.

Plaintiff also argues that the use of the phrase "obvious error" in Indiana Code section 4-38-5-6 necessarily means that an operator "must make the decision whether or not to cancel wagers for obvious error by the end of the contest," because an error cannot be "obvious" if recognized after the event concluded. [Dkt. 133 at 6.] This argument misapprehends both the statute and the record. First, nowhere in the plain language of the statute does it state that a decision must be made before the end of the underlying contest. But more importantly, as Plaintiff himself concedes, DraftKings *did* recognize the error before the end of the LAL/DEN Game. DraftKings almost immediately recognized the erroneous market, acted within minutes to suspend betting, notified affected bettors, and voided the Bet consistent with its

standard procedures. He acknowledges "DraftKings recognized a problem immediately, so the incorrect odds were . . . available for wagering for somewhere between 11 and 13 minutes[.]" [Dkt. 133 at 1.] DraftKings also emailed Plaintiff "during the game noting 'that settlement will be delayed while we review bets placed on these markets.'" [*Id.* at 2.] These undisputed facts confirm DraftKings' prompt decision and action, not delay.

While the Bet was not actually voided until after the LAL/DEN Game concluded, that delay was based on careful review and regulatory coordination—not hesitation. DraftKings' regulatory operations team coordinated with and, for some states, sought prior approval from, regulators before voiding affected bets for Error. [Dkt. 138-1 at 119–120; 126 (30(b)(6) Dep. at 45:22-46:11, 52:8-16); Dkt. 139-2 (Ex. F, October 25, 2023 correspondence from DraftKings to IGC notifying the IGC of DraftKings intent to void the relevant betting market).] DraftKings completed that process, which included interactions with dozens of other states' regulatory agencies, and voided the Bet on October 25, 2023—less than 24 hours after Plaintiff placed it. This brief interval between acceptance and voiding thus confirms due diligence and regulatory compliance, not any lack of clarity as to the obviousness of the error. The notion that the Indiana legislature intended for DraftKings to forego that review process and action a nationwide void within a few hours without any regulatory review or collaboration is nonsensical.

### 4.    DraftKings' Contractual Right to Void Controls

Even if Plaintiff's reading of the statute were correct—and it is not—his claim still fails because the parties' IGC-approved contract expressly authorizes DraftKings

to void bets for error "regardless of whether the event has been settled or not." [Dkt. 138-2 at 40 (Ex. C, General Rule 5.7).] That provision, incorporated into every bet through DraftKings' IGC-approved House Rules, governs this dispute.

Plaintiff's argument that the "applicable law in force" becomes part of the contract does not alter that result. [Dkt. 133 at 4.] Indiana law is incorporated into contracts only to the extent it defines lawful conduct—not to override or create obligations contrary to the parties' express terms. *See, e.g.*, *Ethyl Corp. v. Forcum-Lannom Assocs., Inc.*, 433 N.E.2d 1214, 1220 (Ind. Ct. App. 1982) ("[I]n every forum a contract is governed by the law with a view to which it was made"). The governing statutory and regulatory framework authorizes operator discretion and expressly delegates "obvious error" policies to IGC-approved House Rules. Those rules, which form part of the parties' agreement, plainly permit DraftKings to void wagers even after settlement.

Plaintiff cannot invoke one clause of the Sports Wagering Act while ignoring its concurrent grant of discretion to licensed operators and the IGC's oversight of those policies. The same regulatory scheme he cites is the one that resulted in approval of the very contract—the House Rules—that he now seeks to invalidate.

Plaintiff's interpretation of Indiana Code section 4-38-5-6 finds no support in the statute's text, structure, or purpose—and directly conflicts with the IGC-approved House Rules governing his Bet. The record is undisputed that DraftKings acted precisely as both the law and its Terms and House Rules require: promptly identifying an obvious Error, coordinating with regulators, and voiding the Bet

38

pursuant to its contractual and statutory discretion. Because Plaintiff's reading is inconsistent with the statute, the regulatory framework, and the contract he accepted, his motion must be denied.

## VI.    CONCLUSION

DraftKings respectfully requests that this Court deny Plaintiff's Motion for Summary Judgment, and grant Defendant's Motion for Summary Judgment, entering judgment in favor of DraftKings and dismissing Plaintiff's sole remaining breach of contract claim with prejudice.

Dated: November 17, 2025                    Respectfully submitted,

*/s/ Philip R. Zimmerly*
Philip R. Zimmerly (#30217-06)
Dakota C. Slaughter (#37582-29)
BOSE MCKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
(317) 684-5000 (phone); (317) 684-5173 (fax)
PZimmerly@boselaw.com
DSlaughter@boselaw.com

Richard R. Patch (*pro hac vice*)
Rees F. Morgan (*pro hac vice*)
Emlyn Mandel (*pro hac vice*)
Franklin Krbechek (*pro hac vice*)
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, CA 94104-5500
Telephone: 415.391.4800
Facsimile: 415.989.1663
Email: ef-rrp@cpdb.com
        ef-rfm@cpdb.com
        ef-erm@cpdb.com
        ef-fsk@cpdb.com

Counsel for Defendant
DRAFTKINGS INC.

39

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2025, a copy of the foregoing document was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/  Philip R. Zimmerly

Philip R. Zimmerly